SCOTT ERIK ASPHAUG, OSB #833674
Acting United States Attorney
District of Oregon
**SARAH BARR, WSBA #40758**
Assistant United States Attorney
sarah.barr@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:20-cr-00478-IM-01 |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| DAVID ACOSTA-ROSALES, | |
| Defendant. | |

### Introduction

Defendant is scheduled to appear for sentencing following entry of a guilty plea to Count 1 of an indictment, charging conspiracy to make false statements in the acquisition of firearms, in violation of Title 18, United States Code, sections 922(a)(6), 924(a)(2), and 371. The government recommends a 75-month term of imprisonment, followed by 3 years of supervised release.

/ / /

/ / /

**Government's Sentencing Memorandum**                                                                 **Page 1**

**Factual Background**

A.      **The Offense Conduct**

The pre-sentence report (PSR) describes, in part, the offense conduct for this defendant.[1] Defendant was the leader of a local gun-trafficking cell that bought, transferred, and trafficked nearly 150[2] high-powered assault rifles to be smuggled to Mexico for use by the Jalisco New Generation Cartel's (CJNG) inconceivably violent drug-trafficking operations. The conspiracy worked like a pyramid, with defendant at the top of local operations, a middle layer of co-defendants serving as mass-quantity straw purchasers and recruiters of straw purchasers, and a lower level of straw purchasers below them. Defendant David Acosta-Rosales was the head of the local cell.

In this role, defendant conspired to obtain semi-automatic assault rifles in the District of Oregon and oversee their transportation out of the District. ECF No. 156 at ¶ 5 (plea agreement); Exh. F at 2–5 (sealed). His "boss" in Mexico wanted specific types of high-powered and especially deadly firearms, such as AR-15 and AK-47 platform rifles, semi-automatic .50 caliber Barrett rifles, and premium military type assault rifles such as the FN SCAR. PSR ¶¶ 17–18; Exh. A at 4 (sealed), Exh. B at 2–8 (sealed), Exh. C at 6 (sealed). Here are examples[3] of some of the types of rifles bought:

---

[1] The United States objects to the wholesale deletion of paragraphs 19, 29–35, 37–42, and 46, made in the revised PSR without adequate opportunity for the United States' response.

[2] Guilty pleas entered by this defendant and seven co-defendants to date account for at least 130 admitted firearms. Many more are attributable to the remaining co-defendants and unindicted co-conspirators.

[3] The enclosed images are from the manufacturers' websites.

**Government's Sentencing Memorandum**                                                    **Page 2**

**Barrett 82A1 .50 caliber rifle:**



**FN HERSTAL SCAR 17S .308 (7.62) caliber rifle:**



**Pioneer Arms Sporter AKM-47:**



**Government's Sentencing Memorandum**                                         **Page 3**

Defendant recruited straw purchasers to buy these rifles at gun stores in the Portland and Salem areas, receiving cash from his boss in Mexico and passing the cash, along with a commission, to the straw purchasers or an intermediary, while keeping a commission for himself. ECF No. 156 at ¶ 5 (plea agreement); PSR ¶¶ 17–18. Defendant's first recruit was his own young son.[4] PSR ¶ 82. After the straw purchasers bought the rifles from local gun stores, defendant received them or oversaw the transfer of the rifles to an intermediary or courier for shipment out of the District of Oregon. ECF No. 156 at ¶ 5 (plea agreement); PSR ¶ 45. Before they were shipped, defendant obliterated the serial numbers off some of the rifles and recruited a co-conspirator to obliterate serial numbers. ECF No. 156 at ¶ 5 (plea agreement).

Defendant perpetuated the conspiracy even after several co-conspirators were caught, with many guns seized, by ATF in April 2020. He paid a debt of land to the cartel and was back in their good graces, looking for more guns and weapons to send them and make himself more money. Exh. A at 3, 5, 7; Exh. B at 2–9.

Defendant knew the rifles were going to Mexico. ECF No. 156 at ¶ 5 (plea agreement). He knew they would be used by the cartel "in the hustle," because "they want the impact" to "make a mess." Exh. A at 5; Exh. B at 4, 7. In fact, to meet the cartel's bloodthirst, rifles weren't enough. They also wanted grenades, grenade launchers and belt-fed machine guns. PSR ¶¶ 18, 44; Exh. A at 2, 6; Exh. B at 2, 5–7; Exh. C at 2–5. Defendant obliged. He paid for and took possession of a Lewis Machine & Tool, model M203, 40mm grenade launcher and a TNW, model AAM3, .50 caliber tripod-mounted semi-automatic firearm, which is the semi-automatic version of a .50

---

[4] Llodany David Acosta-Michel is a co-defendant who wisely extricated himself from his father's scheme very early in the conspiracy. Details about the timing and number of firearms bought by his son appeared in the final PSR at paragraph 38, but were removed at defendant's request and do not appear in the revised final PSR.

caliber M2 belt-fed machine gun. *Id.*; PSR ¶ 18. These are images of the grenade launcher and

tripod-mounted firearm he acquired, although he was arrested before he could transfer them out of

Oregon:





On October 1, 2021, defendant paid a $14,000 down payment for these weapons, PSR ¶ 44:





He paid $2,000 more to complete the purchase on October 8, 2021, when he went to pick up the weapons. The weapons arrived in a U-Haul at a meeting spot in the vicinity of a restaurant parking lot. Exh. D at 1 (sealed). Contrary to defendant's assertion in his PSR objection, defendant viewed the grenade launcher and tripod-mounted firearm in the back of the U-Haul. Exh. D at 2, 4–5; Exh. E at 1–5 (sealed). [5] He opted to drive the U-Haul away with the weapons rather than transfer them to his own vehicle. Exh. G (sealed).[6] He took the key to the U-Haul and was arrested before he could drive away. Exh. D at 2, Exh. E at 5.

B.    **The Charges**

On October 6, 2020, a federal grand jury returned a 52-count indictment charging defendant and ten co-defendants with firearms-related offenses. Defendant was charged in Count 1 with conspiracy to make false statements in the acquisition of firearms, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), and 371. He was also charged in Count 51 with possessing and receiving firearms with obliterated serial numbers, in violation of 18 U.S.C. § 922(k) and 924(a)(1)(B), 2, and in Count 52 with smuggling goods from the United States, in violation of 18 U.S.C. § 554(a).

The government will move to dismiss Counts 51 and 52 after imposition of sentence on Count 1.

---

[5] This exhibit consists of screen shots taken from a video recording that was recording the meet. This document was prepared for the sentencing hearing, to provide an accurate depiction of the meeting in response to the inaccurate depiction in defendant's late-filed PSR objections. The full video was available in discovery and can be made available to this Court, upon request.

[6] The transcription was prepared by an ATF special agent in preparation for this sentencing hearing, to provide an accurate depiction of the meeting in response to the inaccurate description presented by defendant in his late-filed objection letter. It derives from an audio-visual recording made during the meet. The full video was available in discovery and can be made available to this Court, upon request.

**Government's Sentencing Memorandum**                                                    **Page 7**

C.      **The Plea Agreement**

The parties entered into a plea agreement, filed September 9, 2021, in which defendant

agreed to plead guilty to Count 1. The government agreed to dismiss the remaining counts at the

time of sentencing. The parties agreed to the following relevant conduct:

|   | Guidelines Provision | Levels |
|---|---|---|
| A. | Base Offense Level, firearm described in 25 U.S.C. 5845(a) [USSG § 2K2.1(a)(5)] | 18 |
| B. | Enhancement for 100-199 firearms [USSG § 2K2.1(b)(1)(D)] | +8 |
| C. | Enhancement for destructive device [USSG § 2K2.1(b)(3)(B)] | +2 |
| D. | Enhancement for obliterated serial numbers [USSG § 2K2.1(b)(4)(B)] | +4 |
| E. | Enhancement for engaging in trafficking firearms [USSG § 2K2.1(b)(5)] | +4 |
| F. | Enhancement for possession with knowledge firearms will be transported out of USA [USSG § 2K2.1(b)(6)(A)] | +4 |
|   | **Adjusted Offense Level** | 40 |

The United States agreed to recommend a sentence of 75 months' imprisonment; defendant is free

to seek a downward departure, adjustment, or variance from the applicable sentencing guideline

range determined by the Court. Defendant agreed to the standard appeal waivers.

**Argument**

A.      **Guidelines Calculation**

The government agrees with the PSR calculations that defendant's total offense level is 34,

and his criminal history category is I, giving him an advisory guidelines range of 151–188 months.[7]

However, because the maximum penalty for his offense is ten years, his guideline range is 120

months. U.S.S.G. § 5G1.1(a).

---

[7] The relevant conduct agreed to by the parties neglected to consider that the cumulative offense
level determined from the application of subsections (b)(1) through (b)(4) may not exceed level
29; the parties therefore over-calculated his total offense level. PSR ¶ 57; U.S.S.G. § 2K2.1.

**Government's Sentencing Memorandum**                                        **Page 8**

B.       **Government's Recommended Sentence**

The government recommends a 75-month term of imprisonment.

Defendant's conduct is unquestionably serious. He was the local leader of a conspiracy that worked to provide an astoundingly violent organization the very weapons it needs to perpetrate its violence. The CJNG is one of the world's "most prolific and violent drug trafficking organizations." *Mexico: Organized Crime and Drug Trafficking Organizations*, Congressional Research Service (July 28, 2020) at 27, available at *https://fas.org/sgp/crs/row/R41576.pdf* (last accessed October 8, 2020). "It is considered an extremely powerful cartel, with a presence in 27 of 32 Mexican states in 2020" and has a "reputation for extreme and intimidating violence." *Id.* at 28. This includes extremely violent attacks and threats against, and the killing of, public officials, innocent civilians, and rival cartel members. *Id.* CJNG is considered Mexico's "most well-armed DTO." *Id.* But those high-powered weapons are not commercially available in Mexico—so the cartel relies on willing co-conspirators, largely in the United States, to supply them.

The CJNG uses illegally smuggled guns to attack, threaten and kill other people to maintain their criminal enterprise. CJNG gun violence is not just occasional or passing. Extreme violence, using firearms, is built into their operating protocol. "[T]he cartel has made the city of Guadalajara and surrounding suburbs into a giant clandestine grave site." Mark Stevenson, *In Mexico, a cartel is taking over: Jalisco New Generation*, Associated Press (March 17, 2020), available at https://abcnews.go.com/International/wireStory/mexico-cartel-taking-jalisco-generation-69657724 (last accessed October 8, 2020). CJNG "is blamed for two of the worst attacks [against Mexican law enforcement] in recent memory: in October [2019], cartel gunmen ambushed and killed 14 state police officers in Michoacán, and there are indications they executed some with

**Government's Sentencing Memorandum**                                    **Page 9**

gunshots to the head. In 2015, cartel gunmen trying to protect their leader shot down a Mexican military helicopter with an RPG."

It is well-known that Tonaya, Mexico—defendant's hometown—houses a major CJNG compound. PSR at "identifying data," ¶ 78. Beth Warren, *How a Mississippi Trooper Almost Took Down the World's Most Powerful Cartel Boss, Louisville Courier Journal* (last updated February 27, 2020), https://www.courier-journal.com/in-depth/news/crime/2019/11/24/ how-mississippi-trooper-almost-took-down-worlds-most-powerful-cartel-boss/4087562002/.

Defendant knew where these guns were going, and that they would be used by the cartel to perpetuate its grave violence—yet he willingly led the local operation that accumulated around 150 guns for this purpose. Defendant was the key player in this scheme. If not for him, there would be no money to buy the guns, no initial recruitment of straw purchasers to buy them, no direction about what type of guns to buy, no obliteration of serial numbers (either by himself or at his instruction), and no transfer of the guns to couriers to transport out of Oregon. He recruited wisely—some of his recruits evolved into the brains of the straw purchasing operation, identifying gun availability and the best deals in local shops. But defendant was the heart, lungs, and bloodflow keeping the operation alive.

Defendant callously risked the lives of countless innocent people for his own financial gain. He pulled his own son into the scheme. Even the seizure of dozens of guns from three of his straw purchasers in April 2020 did not deter him. He continued the operation for six more months, until his arrest. In that time, his dealings escalated. He found new straw purchasers to buy rifles, and he personally acquired a grenade launcher and belt-fed tripod-mounted .50 caliber assault firearm to send to Mexico. These are weapons intended for mass destruction. The Ninth Circuit has noted the "extreme dangerousness" of grenade launchers of the type defendant acquired. *United States v.*

**Government's Sentencing Memorandum**                                                                **Page 10**

*Flores*, 729 F.3d 910, 916 (9th Cir. 2013) (noting they are "designed to penetrate at least two inches of steel armor, can travel up to 400 meters, and contain 1.2 and 1.5 ounces of military grade explosive"). Defendant joked about the violent destruction wrought by the cartel with its guns and weapons. Exh. B at 7. But it should be obvious: sending guns to Mexico to equip a cartel killing machine is no laughing matter.

The United States recognizes defendant's minimal criminal history, long legitimate work history in the United States, and supportive family. PSR ¶¶ 73, 78–82, 90–92. However, these positive factors do not mitigate the seriousness of his offense and the significant and prolonged nature and scope of his role in the conspiracy.

Given the totality of circumstances, and considering the 3553(a) factors, including the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant, a 75-month term of imprisonment and 3-year term of supervised release is appropriate.

**Conclusion**

Based on the foregoing, the government recommends that this Court impose a 75-month term of imprisonment, followed by a 3-year term of supervised release.

Dated: December 1, 2021                          Respectfully submitted,

                                                 SCOTT ERIK ASPHAUG
                                                 Acting United States Attorney
                                                 District of Oregon

                                                 /s/ Sarah Barr
                                                 SARAH BARR, WSBA #40758
                                                 Assistant United States Attorney

**Government's Sentencing Memorandum**                          **Page 11**